The ground upon which the decision of this cause was placed by the superior court, cannot, in my judgment, be sustained. The purchase of the debt due to the Morris Canal and Banking Company from the Long Island Railroad Company, by the plaintiff, did not involve the offence of either maintenance or champerty. It was a purchase of the whole demand, and the purchaser brought this suit not to support or maintain the title of another, but to support and maintain his own title. The plaintiff entered into no agreement to maintain or assist another with money or otherwise, to prosecute or defend a suit in which he had *Page 347 
no interest; nor did he enter into an agreement to carry on a suit at his own expense, in consideration of having a part of the matter sued for. (4 Black. Com. 134, 5; 2 Story Eq. J. sec. 1048, and note 3, and 1050 and 1053.) Since the adoption of the revised statutes, maintenance has not under our laws been recognised as an offence, and champerty only remains an offence in a qualified form. (Mott v. Small, 20 Wend. 221, 2; 22Wend. 405, S.C.; 2 Rev. St. 691, secs. 5, 6, 7, and 8; 1 Rev. St. 739, sec. 148; 3 Rev. St. Appendix, 828, Notesof Revisors, 2 Ed.; 3 Cow. 643 to 649; 4 Wend. 310.) The statutory prohibition against buying a disputed title, is confined to real estate, which is the subject of controversy by suit, or which is not in the possession of the vendor. (2 Rev.St. 691, secs. 5 and 6, 1 Ed.) All choses in action embracing demands which are considered as matters of property or estate, are now assignable either at law or in equity. Nothing is excluded but mere personal torts which die with the party. A claim therefore for property fraudulently or tortiously taken or received, or wrongfully withheld, and even for an injury to either real or personal property, may be assigned. (People v.Tioga C.P. 19 Wend. 73. But the purchase of the plaintiff may be regarded as a purchase at a judicial sale. It was valid for that reason. The assignment of the debt of the Long Island Railroad Company to the plaintiff was made in part payment of his judgments against the Morris Canal and Banking Company, in pursuance of the order of the court of chancery of New Jersey. (6Wend. 224; 5 Barb. Sup. Ct. R. 109. The principles of the common law and the statutes in relation to champerty do not apply to judicial sales, or to sales made under a judgment, order, or decree of a court having competent jurisdiction to order the sale. There are no allegations in the bill in relation to the law of New Jersey, on the subject of maintenance and champerty. In the absence of all evidence to the contrary, the presumption is, that the law of New Jersey on this subject is the same as the law of New York. *Page 348 
The plaintiff and defendants both claim under the Morris Canal and Banking Company. It is insisted, on the part of the plaintiff, that the defendants have no title to the debt of the Long Island Railroad Company, because, — 1. The alleged assignment to the state of Michigan was not executed or authorized by the board of directors of the Morris Canal and Banking Company, but was made by the executive officers of the company without any authority, and so known to be by the state of Michigan. 2. It was void, because made after the insolvency of the Morris Canal and Banking Company, with full notice of such insolvency on the part of the state of Michigan, and in fraud of the statute of New Jersey.
The plaintiff claims under an assignment from the receivers of the Morris Canal and Banking Company, appointed by the court of chancery of the state of New Jersey. A bill was filed by Richards and Selden, judgment creditors of the Morris Canal and Banking Company, in the court of chancery of New Jersey, alleging the insolvency of the company, and praying for an injunction and receiver under an act of that state, of 1829, which provides that when an incorporated company becomes insolvent, it should not be lawful for the directors of the company to sell or assign any of its estate, c., and authorizes the court in a suit commenced by a judgment creditor after the insolvency of the company, to appoint receivers, c., with full power to collect and take into their possession the debts, c., and goods belonging to the company at the time of its insolvency, and to sell the real and personal estate, and pay the proceeds into court to be distributed under the order of the court among the creditors of the company.
The statutes and laws of a country have no intrinsic extra-territorial force. They bind only its own citizens, and citizens of other countries while within its jurisdictional limits; and they bind directly only property within these limits. They do not affect or bind property out of its territory, or persons not resident therein, whether natural born citizens or *Page 349 
others. Whatever extra territorial force these statutes and laws are permitted to have, is the result of the voluntary consent of other nations. This consent is accorded upon the principle of the comity of nations alone, and not from any international obligation to yield to such statutes and laws the slightest obedience. (Story on Confl. of Laws, secs. 7, 8, 18, 20, 22, 23, 28, 38.) But no nation, on any recognised principles of comity, is morally or otherwise bound to enforce foreign laws prejudicial to its own rights, or to the rights of its own subjects. (Story on Confl. of Laws, secs. 244, 512.) Bankrupt and insolvent laws come within this class. They have no extra territorial force or validity. Their enforcement, in any country other than that in which they were enacted, would be prejudicial to the rights of the citizens of such country. The states of the union are regarded as foreign to each other for all purposes not embraced in the constitution of the United States; (Woodhull v.Wagner, Baldwin, C.C.R. 296;) and the bankrupt and insolvent laws of one state have no force or validity in any other state. In this state it has long been regarded as settled law, that a discharge obtained under an insolvent law of another state, is no bar to a suit here, commenced by a citizen of this state for a debt contracted within it. (Van Raugh v. Van Arsdain, 3Caines, 154.) And under the decisions of the supreme court of the United States it must now be held, that a discharge under an insolvent law of this state, will not be a bar even in this state, to an action on a contract made or debt contracted in another state between parties residing there at the time; nor will it discharge a debt contracted within this state by a citizen of the state, as against a creditor who is a citizen of another state. (Van Hook v. Whitlock, 26 Wend. 53. In Error,Nelson, Ch. J.; 3 Story Com. on Con. 256; Hicks v.Hotchkiss, 7 John. ch. 312; 2 Kent C. 393 note;McMillan v. McNeill, 4 Whea. 209; F. M. Bk. c. v.Smith, 6 Whea. 131; Ogden v. Saunders, 12 Whea. 213;Braynard v. Marshall, 8 Pick. 196.) Bankrupt and insolvent *Page 350 
laws of a foreign nation, or of a sister state having no force here, statutory assignments made under the authority of these laws, are not recognised by our courts, as having any validity, or as affecting any property of the bankrupt or insolvent in this state.
Previous to the case of Abraham v. Plestoro, (3 Wend. 548,) the law on this subject was in this state unsettled. Chancellor Kent had decided that a statutory assignment made under a foreign bankrupt law, passed to the assignees of the bankrupt his title to property in this state; but Justice Platt had expressed a contrary opinion. (4 John. Ch. 460, 20 John. 254.) Since the decision, however, of that case by the court of errors, and the decision in Johnson v. Hunt, (23 Wend. 87,) the doctrine that a statutory assignment under a bankrupt or insolvent law of a foreign nation or sister state, does not operate a transfer of property in this state, or of debts due by debtors residing within it, or by corporations chartered under its laws, and doing business within the limits of the state, may be regarded as settled law. A similar doctrine has been advanced and is now considered as an acknowledged rule of jurisprudence by the supreme court of the United States, and by most of the state courts of the Union. (Harrison v. Sterry, 5 Cranch, 289;Ogden v. Saunders, 12 Whea. 213; Plestoro v. Abraham, 1Paige, 236; Holmes v. Remsen, 20 John. 254; 2 Kent, C. 406-7.) The question has generally arisen between the foreign assignees in bankruptcy, and domestic creditors who had sued out an attachment against the personal property of the bankrupt in the state where it was situated. But the principle is not confined to attaching creditors, it embraces sales under judgment and execution; voluntary transfers by the debtor in satisfaction of claims of creditors, or to bona fide purchasers for a valuable consideration; and all other transfers of the property or liens on the same which are valid under the lex loci reisitae. (Story on Confl. sec. 414; 20 John. 261; 23 Wend. 94, 95, 99.)
If the statutory assignment under the foreign bankrupt or *Page 351 
insolvent law, does not transfer the property of the debtor in this state to the foreign assignees, such property should be regarded as liable precisely to the same disposition, as it would have been had there been no such statutory assignment, and no proceedings under such foreign bankrupt or insolvent law. The effect of the decisions in Abraham v. Plestoro, (3 Wend. 538,) and in Johnson v. Hunt, (23 Wend. 89,) is to establish the absolute invalidity of the foreign statutory assignment, as it respects property in this state; not only as between the foreign assignees and domestic creditors, but also as between such assignees and creditors residing in the country, under whose laws the assignment was made, and who are proceeding against the property by attachment or otherwise in our courts. If the foreign statutory assignment is as to both domestic and foreign creditors, and even as to all purposes wholly inoperative as to the personal property of the debtor in this state, it would seem to be in harmony with this doctrine to refuse to foreign assignees the privilege of maintaining suits in their own names in our courts for the recovery of debts due to the foreign bankrupt. A denial of this privilege to foreign assignees would place them on the footing of foreign executors and administrators, who have no right to maintain suits in our courts to recover debts due to their testator or intestate. (Story onConfl. secs. 512, 513.) Permitting foreign assignees to sue in their own names in our courts, is regarded by some distinguished jurists as a recognition of some title in them under the assignment. (Story on Confl. sec. 420; 3 Wend. 552.) But foreign assignees have heretofore only been allowed to maintain suits in their own names as representatives of the bankrupt, and not as assignees having an interest; and they have only been allowed to gain a preference by pursuing the remedies which our laws afford. (Holmes v. Remsen, 20 John. 259.) Where neither the rights of domestic creditors, or of foreign creditors proceeding against the property under our laws are involved, the foreign assignees may be permitted to sue in our courts for the benefit *Page 352 
of all the creditors on principles of national comity, without a surrender of the principle that a foreign statutory assignment does not operate a transfer of property in this state. Allowing foreign assignees to sue in our courts, where neither the rights of our own citizens nor the rights of foreign citizens pursuing the remedies afforded by our laws will be prejudiced, may be regarded as a mere manifestation of respect for a foreign nation, accorded upon principles of national courtesy, and not as a concession that the assignment under which the assignees claim, has under our laws any force or validity in this state.
Voluntary assignments stand upon entirely different principles from involuntary legal assignments. A voluntary assignment has no relation to place. An involuntary legal assignment has the strictest relation to place. The latter made under the legislative authority of a nation can only operate upon property within its own territory. A voluntary conveyance by a party made according to the law of his domicil, will pass his personal estate whatever may be its locality; abroad as well as at home. (Story on Confl. sec. 411, 20 John. 258; 3 Wend. 566.) The control of the owner of personal property has no respect to its locality. He can dispose of it wherever it may be. But the control which the law can exercise over property is limited to the territory of the government by which the law is enacted. This creates a solid distinction between a voluntary conveyance of the owner, and an involuntary conveyance by the mere authority of law. (Story on Confl. sec. 411; 23 Wend. 96.)
The statute of New Jersey under which the receivers of the Morris Canal and Banking Company were appointed, was clearly a statute in the nature of a bankrupt law. It was a general act relating to all incorporated companies, and was enacted to prevent frauds by such companies. It provides that whenever an incorporated company shall become insolvent, it shall not be lawful for any of its officers to sell or assign any of its real or personal estate; and also provides for *Page 353 
a sequestration of all the property of such company, and for a statutory assignment or sale of the same, without its consent; and for a distribution of the proceeds of the sale of the property among the creditors of the company. The assumption under this statute of the disposition of the property of the insolvent company, is in all respects in invitum, and by the mere authority of a legislative enactment. The plaintiff's claim to the debt of the Long Island Railroad Company is under the assignment of the receivers of the Morris Canal and Banking Company, appointed under the provisions of this act of the state of New Jersey. This assignment is nothing more than a statutory assignment. It is an involuntary legal conveyance, made by the mere authority of law, without either the express or implied consent of the Morris Canal and Banking Company. It can only operate on the property of the company within the state of New Jersey. It cannot operate as a transfer of the debt of the Long Island Railroad Company which has its locality in this state, it being a debt due by a corporation chartered by the state and doing business within its jurisdictional limits. The statute of New Jersey being in the nature of a bankrupt law, has no force or validity in this state, either as it respects the citizens of this state or the state of Michigan. (12 Whea. 213; 8 Pick. 196; 26 Wend. 53.) The assignment, therefore, to the state of Michigan, if in other respects valid, is not void, because made in violation of that statute. This statute forms no part of the charter creating the Morris Canal and Banking Company. It does not therefore form a part of the law of its existence. There is nothing in the charter of the company which prohibits the assignment to the state of Michigan of the debt due by the Long Island Railroad Company. The powers of the Morris Canal and Banking Company were derived from its charter. Under that charter, irrespective of the general act of New Jersey to prevent frauds by incorporated companies, the assignment to the state of Michigan, if duly authorized by the directors of the Morris Canal and Banking Company, was *Page 354 
legal and valid. (13 Peters, 587.) But if the assignment to the plaintiff by the receivers of the Morris Canal and Banking Company is allowed to have any validity in this state, it cannot relate back beyond the time of the appointment of the receivers, or the filing of the bill by Richards and Selden against the Morris Canal and Banking Company, and previous to that date that company had assigned the debt in question to the state of Michigan. (4 John. Ch. 477.)
But it is insisted on the part of the plaintiff, that the assignments to the state of Michigan were unauthorized by the directors of the Morris Canal and Banking Company. It is necessary to examine this objection; for if it is well founded, and the state of Michigan acquired no right or title to the debt in question under their assignments, the plaintiff may, on the principles of international comity, be allowed, as the representative of the Morris Canal and Banking Company or of its receivers, to maintain his suit for the recovery of the debt due by the Long Island Railroad Company, on the ground that there is no conflict between him and the creditors of the Morris Canal and Banking Company, or bona fide purchasers claiming under that company.
The plaintiff alleges in his bill that the treasurer of the state of Michigan, notwithstanding his knowledge that the Morris Canal and Banking Company had no power to sell and assign any of its property and effects, prevailed on the executive officers of that company, without the knowledge, assent or approbation of the majority of the directors of the company, to assign the debt due by the Long Island Railroad Company to the state of Michigan, as a collateral security for a debt due to such state by the Morris Canal and Banking Company, and that such assignment was executed by the president and cashier of the latter company, under the common seal of such company. The bill also alleges that the said officers of the Morris Canal and Banking Company, on the 26th April, 1841, assigned to the state of Michigan as a further security for the debt so due to that state by the said *Page 355 
company, without the authority of the directors of such company, another mortgage given by the Long Island Railroad Company as an additional security for the said debt of the latter company, and that such assignment fraudulently represented that it was made in pursuance of a resolution of the board of directors of the Morris Canal and Banking Company. Here is no distinct and direct allegation that the treasurer of the state of Michigan knew at the time he received the first assignment that it was executed without the authority of the directors of the Morris Canal and Banking Company, and there is no allegation whatever that the agents, or state officers of Michigan, had any notice or knowledge that the second assignment was executed without the authority of the directors of that company. The execution of the two assignments, in absence of all proof to the contrary, would probably authorize a presumption that they were executed in pursuance of the authority of the directors, previously given for that purpose. (5 Wend. 575, Ang. Ames on Cor. 3d ed. ch. 7, sec. 6.) The president and cashier of the Morris Canal and Banking Company in executing the assignments were acting within the scope of the legitimate business of the company, and presumptively within the general scope of their authority as agents. (15 John. 44, 54; 1 Cow. 513; 9 Paige, 496; Storyon Agency, sec. 443 and 127; Ang. Ames on Cor. ch. 7,sec. 6.) When an agent is acting within the scope of his usual employment or is held out to the public as having authority to do certain acts, the principal will be bound by the acts of the agent, although the agent in the particular instance has acted without authority. (Story on Agency, sec. 443-127.)
But the plaintiff in his bill alleges with reasonable distinctness, that the first assignment, and expressly that the second assignment, was executed without the authority of the directors of the Morris Canal and Banking Company. If the assignments had been made to the state of Michigan for a new consideration paid at the time, or if the state had relinquished any security then held by it, so as to entitle it to the character *Page 356 
of a bona fide purchaser for a valuable consideration; and if the agents or officers of the state, who obtained the assignments, had no notice of the want of authority of the officers of the Morris Canal and Banking Company to execute such assignments, I think that that company would be estopped from denying that its president and cashier had competent authority to execute and deliver the assignments to the state of Michigan. (6Hill, 96.) Persons dealing with the company had a right to presume that these officers were authorized to sell a security of the company, either in payment of a debt of the company, or to raise money for corporate purposes, such act being within the scope of the legitimate business of the company, and also within the scope of the usual employment of such officers as agents. But inasmuch as the state of Michigan received the assignments as collateral security merely, for an antecedent debt, the Morris Canal and Banking Company, or its representatives, are not estopped from denying the authority of its president and cashier to execute and deliver the assignments.
As the defendant Thompson had notice of the defect of the title of the state of Michigan at the time he purchased, he is entitled to no other rights than those possessed by the state.
Upon the ground, therefore, that according to the allegations of the bill, the two assignments to the state of Michigan were executed by the president and cashier of the Morris Canal and Banking Company, without the authority of the directors of that company, I am of opinion that the judgment of the superior court should be reversed, and that the demurrer to the bill be overruled, with liberty to the defendants to answer the bill. My brethren concur with me in the opinion that the judgment should be reversed upon this ground. They also concur with me in the opinion that the purchase by the plaintiff of the debt due by the Long Island Railroad Company did not involve the offence, of either maintenance or champerty. As to the other questions discussed *Page 357 
by me in the foregoing opinion, I do not understand any of my brethren, except the chief judge, as expressing any opinion.
Judgment reversed